IN THE UNITED STATES DISTRICT COURT FOR
THE SOUTHERN DISTRICT OF WEST VIRGINIA

HUNTINGTON DIVISION

UNITED STATES OF AMERICA

v.                                                    CRIMINAL ACTION NO. 3:03-00053

SHIRLEY J. MCCLANAHAN

MEMORANDUM OPINION AND ORDER

Presently pending before the Court is Movant Larry McClanahan's Motion for
Termination of Restitution Payment Schedule. *Mot. for Termination*, ECF No. 248. Larry
McClanahan ("Mr. McClanahan") is the surviving spouse of Defendant Shirley J. McClanahan
and executor of her estate. The Government timely filed a Response opposing the Motion, and Mr.
McClanahan did the same with his Reply. *Resp. in Opp'n*, ECF No. 253; *Reply*, ECF No. 257. The
Government also filed an untimely "Supplemental Exhibit" without seeking leave to do so.
*Supplemental Ex.*, ECF No. 256. The issues have been adequately presented to the Court through
the parties' briefs and the issues they raise are ripe for resolution. For the reasons set forth below,
the Court **GRANTS** the Motion.

I. BACKGROUND

On August 5, 2003, Defendant Shirley J. McClanahan ("Mrs. McClanahan") was
sentenced to serve a forty-six-month term of imprisonment and to pay restitution in the amount of
$405,844.11 for violating 18 U.S.C. § 657—that is, for embezzlement with the intent to knowingly
defraud the Huntington, West Virginia Policeman's Federal Credit Union ("Credit Union").
*Judgment*, ECF No. 22, at 1. A public school teacher for her adult life, Mrs. McClanahan began a
second job as a bookkeeper for the Credit Union in 1982. *PSR*, ECF No. 259, at 13. Over the

course of the next two decades, Mrs. McClanahan siphoned $405,884.11 from the Credit Union by writing checks to herself or her husband and by creating fictitious loans for other members. *Id.* at 6. Her husband—Movant Larry McClanahan—remained unaware of her actions. The same cannot be said of the National Credit Union Administration, which learned of the missing funds in 2002. Following an investigation, a single-count Information was filed in this Court charging Mrs. McClanahan with a violation of 18 U.S.C. § 657 on March 7, 2003.

Mrs. McClanahan promptly pleaded guilty to the charge, and this Court imposed a restitution obligation of $405,844.11 upon her at her sentencing. *Judgment*, at 5. After a number of initial adjustments in her restitution payment schedule, the Court ordered Mrs. McClanahan to pay restitution in the amount of 25% of her monthly payments from her state pension under the Consumer Credit Protection Act. *United States v. McClanahan*, No. 3:03-00053, 2006 WL 1455698, at *3 (S.D.W. Va. May 24, 2006). That limitation remained in effect throughout Mrs. McClanahan's term of incarceration and the years to follow, and she would come to repay $112,936.81 of her $405,844.11 obligation.

At some point in 2018, Mrs. McClanahan was diagnosed with a colon disorder that would eventually prove fatal. *Mot. to Terminate*, at 2. On March 11, 2019, Mrs. McClanahan died and left her husband as her "sole beneficiary, legatee, and devisee of her estate." *Id.* At the time of her death, her non-probate real estate holdings valued $113,600. Other non-probate assets included a $10,000 life insurance policy through New York Life, a $2,500 death benefit from the Public Employees Insurance Agency of West Virginia Retirement Board, and a separate $2,500 death benefit from the Cabell County Association of Retired School Teachers. A survivorship arrangement also provided for a monthly survivorship benefit in the amount of $2,045.51 to Mr. McClanahan.

It is essentially these assets that are the subject of the present dispute, which began in January 2020 when the United States Attorney's Office began demanding the sum of $292,906.30 from Mr. McClanahan (whom they identified as a "Beneficiary" of his wife's estate). *Mem. of Law*, ECF No. 249, at 3. Mr. McClanahan retained counsel in February 2020, who asked that the Government provide authority for the proposition that it could collect restitution on non-probate assets held by his client. *Id.* The Government waited until June 9, 2020 to respond, and then only to threaten suit for fraudulent transfer and demand that Mr. McClanahan pay his entire survivorship benefit towards restitution. *Pl.'s Ex. G*, ECF No. 248-7, at 1. This demand apparently encompassed the entirety of his benefit payment—not just the 25% that Mrs. McClanahan had paid during her lifetime. *Id.* The Government also contacted the Retirement Board in an attempt to interrupt benefit payments to Mr. McClanahan. *Pl.'s Ex. F*, ECF No. 248-6, at 1.

Unconvinced of the Government's authority, Mr. McClanahan filed the instant Motion for Termination of Restitution Payment Schedule on June 26, 2020, along with a Memorandum of Law. The Government opposed the Motion, and sought relief of its own: (1) judicial notice that Mrs. McClanahan's estate Assets included the non-probate assets listed above, as well as two Chase bank accounts, (2) an order directing Mr. McClanahan to provide an accounting of disbursals from Mrs. McClanahan's estate, (3) an order requiring Mr. McClanahan to immediately surrender $30,000 to the Government, (4) and a separate garnishment order providing that Mr. McClanahan's survivor benefits would be paid to the Government.[1]  *Gov't Mem. of Law*, ECF No.

---

[1] The Government also filed an untimely "Supplemental Exhibit" on July 16, 2020, showing that Mrs. McClanahan completed a Benefit Option Form several days prior to executing her plea agreement wherein she chose slightly reduced monthly payments in exchange for a survivorship benefit to her husband. *Supplemental Ex.*, ECF No. 256, at 5–6. The implication appears to be that Mrs. McClanahan elected the survivorship plan rather than a straightforward lifetime annuity to lessen her restitution payments. Candidly, this is as irrelevant as it is unsupported. The question posed by Mr. McClanahan's Motion is whether certain non-probate

254, at 14. It is to the parties' arguments in support of their respective positions that the Court now turns.

## II. DISCUSSION

The pending Motion implicates two distinct questions: first, whether Mr. McClanahan has standing to request the relief he is seeking, and second, whether the Mandatory Victims Restitution Act permits the Government to pursue recovery of a third-party's assets to satisfy a deceased defendant's restitution obligations. In this apparent case of first impression, the Court concludes that the answer to the first question is yes and the answer to the second question is no.

### A. Standing

The Court begins by considering whether the relatively unusual procedural posture of this case affects its jurisdiction to entertain Mr. McClanahan's Motion. As the Motion is styled as one "for Termination of Restitution Payment Schedule," the Government argues that Mr. McClanahan "is not qualified under 18 U.S.C. § 3572(d)(3)" to raise his claims.[2] *Gov't Mem. of Law*, at 7. In relevant part, that statute provides that a "court may, on its own motion or the motion of any party, adjust the payment schedule [of a restitution obligation], or require immediate payment in full, as the interest of justice require." 18 U.S.C. § 3572(d)(3). The Government's argument, such as it is,

---

assets are subject to his wife's restitution payments. That his wife *may* have been motivated by a desire to lessen her restitution obligations simply has no bearing on that issue. And the Court emphasizes the word *may* for a reason—because the Government's insinuation is nothing more than conjecture.

[2] The Government does not appear to argue that Mr. McClanahan lacks constitutional standing to pursue his claims, and rightly so. *See, e.g.*, *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992) (holding that standing "contains three elements"—an "injury in fact," a "causal connection between the injury and the conduct complained of," and a likelihood "that the injury will be redressed by a favorable decision" (internal quotation marks omitted)). The question here narrowly concerns whether Mr. McClanahan's Motion is properly before the Court in the context of his wife's criminal action.

appears to be that restitution is part of Mrs. McClanahan's criminal sentence and that the time to raise a challenge to that sentence under 18 U.S.C. § 2255 has passed. *Gov't Mem. of Law*, at ¶ 28.

That argument fails for two readily apparent reasons. First, the Court may "adjust the payment schedule" of a defendant's restitution obligation "on its own motion." *See* 18 U.S.C. § 3572(d)(3). Whether or not Mr. McClanahan has statutory standing to seek modification of his wife's restitution obligations is thus essentially an academic question, as the Court is free to act with or without his intervention. Second (and even more conspicuous) is the fact that the Government has been serving demands for payment upon Mr. McClanahan as executor of Mrs. McClanahan's estate. *Gov't Mem. of Law*, at ¶ 27. The Government's argument therefore boils down to two irreconcilable propositions: that Mr. McClanahan is the appropriate party upon which to serve payment demands, and the inappropriate party to object to those payment demands. The Court is unable to disentangle those competing claims, and thus has ample authority to consider Mr. McClanahan's Motion.

### B. Mandatory Victims Restitution Act

Having resolved that Mr. McClanahan is entitled to raise his argument in the context of this action, the Court turns to the substance of his claims. At core, Mr. McClanahan contends that the Government is unlawfully attempting to collect various non-probate assets—a life insurance policy, two one-time death benefits, and a monthly survivorship benefit—to use towards his wife's restitution obligation. The Government concedes that this is exactly what it is doing, though it argues that the Mandatory Victims Restitution Act ("MVRA") grants it the authority to do so.

Congress enacted the MVRA in 1996 as part of the Antiterrorism and Effective Death Penalty Act, *see* Pub. L. No. 104-132, 110 Stat. 1214 (1996), which "made payment of restitution as part of a criminal sentence mandatory for certain categories of offenses that directly and

proximately caused a victim to suffer either a physical or a pecuniary loss," *United States v. Abdelbary*, 746 F.3d 570, 575 (4th Cir. 2014). Pursuant to this authority, the Government is empowered to enforce an order of restitution "against all property or rights to property *of the person fined*." 18 U.S.C. § 3613(a) (emphasis added). Congress amended the MVRA in 2016 to provide that "[i]n the event of the death of the person ordered to pay restitution, the individual's estate will be held responsible for any unpaid balance of that restitution amount." Pub. L. No. 114-324, § 2(b), 130 Stat. 1948 (2016). Mr. McClanahan does not contest this authority; rather, he argues that his wife's estate does not include the assets that the Government is demanding. The Government disagrees, and claims it is entitled to the entirety of Mr. McClanahan's survivorship benefits,[3] two $2,500 death benefits, and the policy value of a $10,000 life insurance agreement.[4]

As both parties note, there is little (and, really, no) precedent anywhere in the federal court system to guide the Court's analysis. And there is a good reason for that: the Government's

---

[3] The Court pauses briefly to note that this is one of the more facially unreasonable aspects of the Government's argument. *See Gov't Mem. of Law*, at ¶ 47. The contention that it may recover 100% of Mr. McClanahan's survivorship benefit ignores this Court's clear determination that the Consumer Credit Protection Act ("CCPA"), 15 U.S.C. § 1601 *et seq*., limited garnishment of Mrs. McClanahan's pension to 25% of her monthly payments. *See McClanahan*, 2006 WL 1455698, at *3. The CCPA's 25% garnishment cap applies to "earnings," which include "*compensation paid or payable* for personal services, whether denominated as wages, salary, commission, bonus, or otherwise, and *includes periodic payments pursuant to a pension or retirement program*." 15 U.S.C. § 1672(a) (emphasis added). Mr. McClanahan's regular survivorship benefit fits squarely within this definition, and would at the very least be subject to the CCPA's 25% cap if it were part of Mrs. McClanahan's estate (which, as the court will explain, it is not).

[4] There is some ambiguity as to other assets the Government believes it is entitled to as well. In the Memorandum of Law filed concurrently with their Response in Opposition, the Government also seeks to recover the balance of a Chase Savings Account and Chase Checking Account they claim "were hidden from the United States despite its numerous inquiries and efforts." *Gov't Mem. of Law*, at 13. It is entirely unclear what these bank accounts are or how much they contain, and they are casually mentioned for the first time in the conclusion section of the Government's Memorandum. Nevertheless, the same analysis applies to these accounts as it does to the other property referenced throughout this Memorandum Opinion and Order: if they contain assets that are not a part of Mrs. McClanahan's estate, the Government may not use those assets to satisfy this Court's restitution order.

argument—that a defendant's "estate" encompasses property that a defendant never owned and had no right to own—toes the line between the illogical and the absurd. To make this point clear, the Court turns to a review of state law.[5]

In West Virginia, "[t]he terms 'estate' or 'property' mean the real or personal property or interest therein of a decedent or transferor and includes," *inter alia*, "[a]ll intangible personal property." W. Va. Code § 11-11-2(b)(4). The Government argues that Mrs. McClanahan's life insurance policy, her death benefits, and her survivorship benefits fall within this category, and for some reason cites to the Black's Law Dictionary definition of the term "asset" to make its point. *Gov't Mem. of Law*, at 9. A less convoluted approach would be to read several paragraphs further to reach the statutory definition of "intangible personal property"—that is, "incorporeal personal property including deposits in banks, negotiable instruments, mortgages, debts, receivables, shares of stock, bonds, notes, credits, evidences of an interest in personal property, evidences of debt and chooses [sic] in action generally." W. Va. Code § 11-11-2(b)(8). While not exhaustive, note what is absent: any mention of life insurance, death benefits, or survivorship benefits. And that makes sense in a context where, as here, the contested assets are of the type that a decedent has no right to own. West Virginia courts have long recognized that applying the "familiar maxim *expressio unius est exclusio alterius*"—"the express mention of one thing implies the exclusion of another"—is appropriate in interpreting ambiguous statutory provisions. *Manchin v. Dunfee*, 327 S.E.2d 710, 711, Syl. Pt. 3 (W. Va. 1984). Applying that maxim here leads to just one conclusion: that life insurance, death benefits, or survivorship benefits are not "intangible personal property" of the decedent, and therefore not part of an "estate" under West Virginia law.

---

[5] The Court's reliance on state law stems from analogous cases adjudicating the rights of owners to property in other contexts. *See United States v. Craft*, 535 U.S. 274, 278 (2002) (looking "initially to state law to determine what rights" a taxpayer possessed "in the property the Government seeks to reach").

Arguments to the contrary are unavailing. First, the Court notes that the Government relies on *E.M. Meadows Funeral Home v. Hinton*, 195 S.E. 346 (W. Va. 1938), for the proposition that "West Virginia authority requires beneficiaries to surrender their gifts if an estate is insolvent." *Gov't Mem. of Law*, at ¶ 39. The grounds upon which *Hinton* is inapposite are obvious, as even a short review of its underlying facts makes clear. In *Hinton*, a woman died intestate and was buried by a funeral home. *Hinton*, 195 S.E. at 347. The funeral home sought payment for its services, and claimed that the decedent's executors were responsible for reimbursing it by selling her assets. *Id.* One asset in particular—a diamond ring she had given as a gift to a friend while on her deathbed—was not appraised as part of her estate. *Id.* Nevertheless, the court quoted an 1859 case from the Supreme Judicial Court of Massachusetts to hold that deathbed gifts were not shielded from demands on the decedent's estate because "[a] man is bound to be just before he is generous." *Id.* at 348 (quoting *Chase v. Redding*, 13 Gray 418, 420 (Mass. 1859)).

Put plainly, the disputed ownership of Miss Hinton's ring does not dictate the outcome here. First, there is the obvious fact that *Hinton* is over 180 years old and has since been mentioned just three times by the Supreme Court of Appeals; a watershed decision, this is not. It is also worth considering the Supreme Court of Appeals' precise holding: that "[t]he gift, therefore, must give way, so far as may be necessary, to discharge the lawful demands *against decedent's estate*." *Id.* (emphasis added). Of course, Mr. McClanahan—as executor of his wife's estate—agrees that he would be responsible for paying any demands raised *against the estate*. His entire contention is that the contested property here is *not* part of the estate, and therefore not subject to any demands against the estate. Perhaps most significantly, *Hinton* is a case about a *gift causa mortis*—that is, a "gift made in contemplation of the donor's imminent death." *Gift Causa Mortis*, Black's Law Dictionary (10th ed. 2009). The court reasoned that such gifts, while valid, "cannot avail against

creditors." *Hinton*, 195 S.E. at 348. If Mrs. McClanahan had given any funds to her husband as gifts prior to her death, *Hinton* could bear on this Court's reasoning. But once again, this misses the very thrust of Mr. McClanahan's argument: that his wife could not have provided him with the policy value of her life insurance, death benefits, or survivorship benefits at any point during her life.

The Government also argues that "all property or rights to property of the person fined" referenced in 18 U.S.C. § 3613(a) "includes assets owned or controlled by the defendant." *Gov't Mem. of Law*, at ¶ 30 (internal quotation marks omitted). The language "owned or controlled by the defendant" is drawn from 18 U.S.C. § 3664(d)(3), a procedural provision that requires "a complete listing of all assets owned or controlled by the defendant as of the date on which the defendant was arrested . . . ." There is no indication that Congress ever attempted to connect this procedural requirement for a list of assets to the scope of substantive authority over "all property or rights to property of the person fined." The Government's focus on the notion of "control" in determining the scope of a defendant's estate is therefore misplaced, as that language narrowly applies to the required contents of a list to be provided to a probation officer. Of course, the Court is unconvinced that this argument would aid the Government even if it were not flawed. Mrs. McClanahan never "controlled" her survivorship benefits, death benefits, or the policy value of her life insurance, because each asset required her death for any individual to assert control over them.

Finally, the Government argues that drawing a distinction between probate assets and non-probate assets would render Congress' 2016 amendment to the MVRA—permitting recovery against a defendant's estate—"without meaning." *Gov't Mem. of Law*, at ¶ 40. This is, bluntly, a perplexing argument. Distinguishing between probate and non-probate assets gives the amendment a very clear meaning: that crime victims may recover restitution from a defendant's

estate, but not from outside a defendant's estate. For Congress to go further and permit the Government to recover a restitution obligation from individuals other than convicted defendants would raise serious constitutional concerns that Congress prudently avoided.

In fixating on narrow provisions of state law and the Government's principal contentions, it is easy to lose sight of the forest for the trees. At bottom, the Government's argument is that the benefits Mr. McClanahan seeks to receive and retain are the property of Mrs. McClanahan's estate. Yet the very nature of the contested assets belies this self-defeating argument. Mrs. McClanahan had every right to assign the policy value of her life insurance to her estate—and chose not to. Had she done so, that policy value would constitute the intangible personal property of her estate. But as it exists now, the policy value of her life insurance contract is the property of Mr. McClanahan, not of his wife's estate. The Government argues that this distinction would permit a defendant to "direct *his assets* to a specific beneficiary upon his death to keep his gains out of the hands of his victim." *Id.* at ¶ 41 (emphasis added). Yet to the extent a defendant attempts to direct or shield his assets, the Government may—like any other creditor—use liens or other measures to protect its interest.

The Court does not discount the Government's interest in ensuring that restitution is paid to crime victims in full. But to reason that this interest is so expansive as to permit the Government to enforce this Court's judgment against someone other than Mrs. McClanahan and her estate would be deeply pernicious. The Government argues that a parade of horribles inevitably follows from this logic; unscrupulous defendants placing their assets in trusts to avoid making payments from their estates, to take one example. Yet the consequences of any other decision would be even more troubling, permitting government officials to enforce criminal judgments against individuals who have committed no crime.

-10-

This Court ordered Shirley McClanahan to make $405,844.11 in restitution payments as part of her sentence. Now that she is dead, her estate is liable for the balance of that amount. But her husband—who was not prosecuted, convicted, or sentenced for any crime—is not responsible for using his own assets to make his late wife's restitution payments. The Motion is granted to the extent the Government seeks to recover those assets.

### III. CONCLUSION

Consistent with the foregoing analysis, the Court **GRANTS** the Motion, ECF No. 248, and **ORDERS** the Government to terminate any restitution obligation imposed against Mr. McClanahan's assets, including (1) the policy value of Mrs. McClanahan's AARP/New York Life Insurance Policy, (2) the Public Employees Insurance Agency of West Virginia Retirement Board Death Benefit, (3) the Cabell County Association of Retired School Teachers Death Benefit, (4) the West Virginia Consolidated Public Retirement Board Survivor Benefit, and (5) any other asset that is not a part of Mrs. McClanahan's estate, including real property and bank accounts. The Court further **ORDERS** the Government to notify the West Virginia Consolidated Public Retirement Board that it has no further claim on Mr. McClanahan's survivor benefits. Nothing in this Memorandum Opinion and Order should be construed as terminating those restitution obligations owed by Mrs. McClanahan's estate.

The Court **DIRECTS** the Clerk to send a copy of this Memorandum Opinion and Order to counsel of record, the West Virginia Consolidated Public Retirement Board, and any unrepresented parties.

ENTER:          July 31, 2020

ROBERT C. CHAMBERS
UNITED STATES DISTRICT JUDGE